Good morning, and may it please the Court, Susan Oxford, representing the Equal Employment Opportunity Commission, as appellant. I'd like to reserve five minutes of my time for rebuttal. The District Court abused its discretion when it awarded $3.3 million in attorneys' fees against the EEOC. EEOC brought this lawsuit to remedy sexual harassment of a class of female truck drivers. For four and a half years, we litigated the merits of this case. We tried to get relief. For each of the women, we learned, had been harmed by the harassment. Harassment ranging up to and including rape at the hands of a male trainer or co-driver. We lost the bulk of our case, but our case was not frivolous. The Court imposed fees based on two general categories of claimants. $1.5 million for 69 claimants dismissed based on pre-suit requirements, and 71 claimants dismissed on summary judgment. EEOC had a reasonable basis for seeking relief for all 140 claimants. Starting with the pre-suit requirements group. Counsel, that part of the case is over in terms of whether or not there were merits to many of those claims. It's been determined that there wasn't. The issue is not whether we were right or wrong, that we could identify additional claimants, or seek relief for individuals who are dismissed on summary judgment. The question here is, did we have a reasonable basis for thinking that we could identify additional claimants? And we had far more than some basis. The standard this Court has established, some basis for our claims. We had far more than some basis for thinking that we could identify additional claimants after we filed suit. Well, how is that going to bear on the specific attorney's fee question of which this case is involved? 1.5 million of the fees were imposed exclusively because claimants whom Judge Reed found to be trial-worthy, claimants that she would otherwise have gone to trial, because EEOC identified those individuals after we filed suit. That's a large, almost half of the fees, approximately half of the claimants, and the only basis for awarding fees against EEOC on those cases that otherwise had potential merit, that should have gone to a jury, the only basis is we identified those individuals after we filed suit. And we had ample evidence, ample basis, to believe we could do that. First of all, Judge Murphy's dissent, she characterized this Court's 2012 ruling as a new administrative requirement, imposing unprecedented obligations on the EEOC, and she was correct. When this Court ruled in 2012, the Eighth Circuit had never before addressed this question. Six circuits had. All six said, held, or suggested EEOC could do exactly what we did here. After this Court issued its 2012 decision, four more circuits spoke on the exact question. Two circuits reconfirmed their rulings that we knew about when we filed this lawsuit, and two more circuits joined. The Supreme Court had ruled in general telephone years before we filed this lawsuit that EEOC could identify additional class members after suit was filed, based on just a handful of charges in that case. And after this Court ruled that rejected our position on the substance of it, the Supreme Court in mock mining held that EEOC satisfied its pre-suit requirements, the conciliation provision, which is the only requirement the statute imposes before we file suit, can satisfy that if we identify the individual claimant or the class of claimants. And in mock mining, the defendant employer had argued to the Supreme Court that EEOC should be required during conciliation to identify each of the claimants on whose behalf it sought relief. And the Supreme Court said expressly, we reject the checklist that the defendant is asking us to adopt here for EEOC's conciliation obligation. And if you look at the brief that they're referring to in the opinion, the checklist includes that we would have identified the victims or claimants during the administrative process. Not only did Judge Murphy dissent on this issue, two other members of this Court voted with her to rehear the case en banc. And it took the district judge 40 pages to explain her ruling. This Court held in Williams when it reversed fees that were imposed based on summary judgment. Counsel, it still seems like you're re-arguing the prior phases of this case and not where we are now on remand from the Supreme Court. I am not making these arguments because I think there's any grounds to revisit this issue on terms of this lawsuit. We lost on this issue. But we had a reasonable basis for arguing it. Judge Reed imposed fees on us for $1.5 million for 69 claimants solely because we had not identified them during the administrative process. And as our brief explains, we had a reasonable basis for thinking we could do that. This Court only requires that we had some basis. And we outline in our briefs, and I've reviewed here today, the ample basis we had for thinking this was allowed. We understand we lost on this issue. But it wasn't a frivolous position to take, and that's the only way that the Court could impose fees on the EOC for those 69 claimants. Likewise, the District Court imposed $1.8 million of this fee award for 71 claimants that the Court dismissed on summary judgment. Again, we lost on those claimants. We can't revisit that. But we had a reasonable basis for seeking relief for each of those women. And when CRST moved for fees, it pointed out that we lost and it re-argued the reason the judge ruled in CRST's favor. And when Judge Reed explained in the fee decision, she revisited the basis on which she had granted summary judgment. But for each of those, there's four different categories of summary judgment claimants. And for each one, we had a basis in legal precedent for taking our legal position, and we had ample basis in the factual record for advancing those arguments on behalf of each of our claimants. I'd actually like to emphasize three points in particular that underscore the non-frivolousness of EEOC's position in this litigation. First of all, the two legal questions on which Judge Murphy agreed with the EEOC, number one, that we could identify additional women after we filed suit, and number two, that CRST's trainers were supervisors under these unique situation, those two legal rulings encompass more than three-quarters of the claimants on whom Judge Reed based the fee award. 110 out of the 140 women are encompassed within those two legal rulings. In addition, it took Judge Reed many pages to reject the EEOC's position. Volume 18 of the appendix, which is about 300 pages long, includes the seven summary judgment decisions that Judge Reed issued, her order to show cause on the pre-suit requirements, and then this Court's lengthy decision affirming her with the dissent of one member of this Court. This Court said in Williams that where it took a district court many pages to explain why the plaintiff lost, and where, in that case, this Court affirmed the defendant in Williams, affirmed summary judgment in favor of the defendant in a 10-page decision, and this Court held that demonstrates that there's some substance to the claim that the plaintiff, and reversed fees. And thirdly, and this is very significant, Judge Reed denied CRST's request for appellate fees. It's only a paragraph long in the September 2017 fee award, but in that paragraph Judge Reed says that CRST has not demonstrated the standard necessary for obtaining fees on appeal. The standard is the same. The standard is that the plaintiff had no, did not have any basis for advancing the arguments and making the factual contentions that the plaintiff made. The, and I call the Court's attention particularly to the fact that 56 of the summary judgment claimants, by far the largest group on which Judge Reed awarded fees, involve CRST's liability. Whether or not CRST had notice soon enough, and whether or not CRST took steps in response that were effective enough. Those 56 claimants, the legal arguments that EOC advanced below in opposing summary judgment for those 56 claimants are the identical arguments that we advanced on appeal. The same arguments that Judge Reed held in her one paragraph denial of appellate fees, which CRST did not appeal and which we contend was correct. They are the same arguments on which she based fees against EOC. I'd like to take another minute to talk about two of the smaller subsets of summary judgment claimants. The District Court imposed fees for 11 claimants based on her determination that not only were they not severe or pervasive enough to withstand summary judgment, but they were actually frivolous. For five claimants, the District Court denied fees where CRST argued our, our argument about severe or pervasive was frivolous and Judge Reed agreed on summary judgment, but denied fees because she said our, the severity and pervasiveness was sufficient to not be frivolous. If you look at the, her description, she has a chart in the decision where she summarizes. If you look at the description of what happened to those women, and then you look at the description of what happened to the eight claimants in which we argued were not severe or pervasive, were not frivolous. Which, which order, the chart you're referring to now, which order was that in? It was in the September. September. September 2017. 2017, that's correct. And I can provide the page number on rebuttal. I have it at council table. But if you look at, we've summarized for the eight women, eight of the 11 women in which Judge Reed imposed fees solely because our allegations of, were not sufficiently severe or pervasive. For eight of those women, you look at our description in our brief of what they experienced. It's very similar. It's hard to distinguish how that differs except in perhaps the amount. But this court said in Hathaway, there is no bright line between what constitutes actionable harassment and which constitutes merely unpleasant conduct. In here, the women who, our claimants, the women who were experiencing harassment, were located in the cab of a truck on long haul trips far away from CRSTs, supervisors and managers, far from their homes, for days on end in the cab of a truck. So whatever conduct they were experiencing in that very unusual workplace had a heightened impact because they couldn't get away. And the examples are myriad in the record, but one woman was calling CRST to report her driver's harassment. And he, meanwhile, just set her bags on the side of the road and drove off. Other women tried to get away from the harassers so they could make the phone call and the harassers basically stalked them at truck stops and prevented them from using the Qualcomm system in the cab of the truck. So this was, whatever was happening is a heightened experience that the women had. And what did the logistic court view of those claims? The logistic court granted summary judgment because some women were not able to provide notice to CRST while the harassment was still happening. Other women because CRST's response, the court said, was effective. And I'd like to emphasize that as well. CRST makes no bones about the fact that its standard response was, separate the two drivers. That's a good first move. It also makes no bones about the fact that it then conducted no investigation. If you read the depositions of the two individuals, there are only two for this whole company, responsible for taking complaints. HR Director Jim Barnes and his assistant Lisa. And in their depositions they say, we did not try to find out what happened. It wouldn't matter. All we're going to do is separate the two drivers. And while that might have been fine for a harasser who was merely using crude and disparaging language, Gloria South reported her repeated rapes by her trainer who had threatened her with a gun, reported them to Jim Barnes, and he said, that man will get fired. But if you look at the positive work environment chart that we add as the last three pages of the addendum, you can look and you can find Gloria South's name and see that her rapist got a verbal warning, just like the harasser who was using crude language or urinating into a bottle and leaving the cup or the bottle in the cup holder in the truck. I see that I'm into my rebuttal time. I'm happy to answer any other questions or reserve the rest of my time for rebuttal. Thank you, Ms. Zunz. Mr. Mathias. May it please the court and counsel, I'm John Mathias and I'm here on behalf of CRST, Van Expedited. In her own words, the district judge relied upon three things in making this fee award. First of all, she relied upon the realities of the case.  Secondly, how it was litigated. And thirdly, her own unique perspective on these proceedings. Now, this aligns with Supreme Court guidance from both Fox and more recently from Goodyear that in making fee awards, a district court can take into account its overall sense of a suit and that its superior understanding of the litigation should be afforded substantial deference. Counsel, would you please be sure to address the concern raised by the EEOC with respect to Fox and the use of pro rata analysis in arriving at the fee. That seemed to be a major point in their, not a major point, but it was a point in their briefing. It seems that precedent is one that our court hasn't specifically. All right. So then with respect to Fox, of course, Fox is the case that requires that you can't recover any fees unless you can show that you would not have incurred them unless the claims were frivolous, unreasonable, or groundless. So your question, Judge Smith, has to do with what they call the pro rata approach. So in this case, as you know, there were a large number of claims and they could be divided. You might want to raise the lectern a little bit. There's a button there just to your right. So Fox v. Vice is what we're talking about here. Yes. And so what Judge Reed did, and, of course, as Justice Kagan said in Fox v. Vice, that litigation is messy. A case like this is particularly messy. We had many different kinds of claims and they were, at the end of the day, divisible into two categories, one that was the claims that were dismissed for failure to meet pre-suit requirements and the second claims that were dismissed on summary judgment for various reasons. So what the court did was to subtract from the overall original fee award that Your Honor has considered before the amounts that had been held previously that were unrecoverable for various reasons. So they subtracted that and made some other subtractions as well and then took the remainder of the award and divided it according in two categories. It took an average amount for each claimant that was dismissed on summary judgment grounds and then it took an average amount for claimants that were dismissed for failure to meet pre-suit requirements. And that's what happened. She multiplied the average by the numbers and came out with the award. That's what has been called pro rata. But I wouldn't really call it that because there was a deep dive by the judge into each one of these claims to determine whether or not they met the FOX standards. So you're saying what the district court did shouldn't be classified as a pro rata allocation that FOX says is improper? Not in the sense that it has been held to be improper where you take the overall amount of fees and then divide it by the ten defendants. I think there's one case that had ten defendants. Without regard to whether, without ever really looking at the individual claims to determine as a matter of fact whether amounts were expended on those cases. So for example, if you have a case where you have ten defendants, one of them was dismissed at the outset for failure to state a claim. The nine others had varying amounts of time spent to get rid of them. If you just have a pro rata approach under those circumstances, it's been held to be unlawful. However, here that wasn't what happened at all. So it's sufficient if she just separates them into classes and then divides amongst them? No, that's a good first step. But what she did beyond that was to take a look at what the, actually literally the invoices. There's hundreds of hours that are spent on this. Look at the invoices and see. You'll see for the individual summary judgment claimants, for example, that we had different drivers, different trucks, different times, different circumstances, different allegations, different depositions, different fact inquiries. And you could tie the attorney time to those individual cases. We had different, when we made motions for summary judgment, we had to literally make it with respect to each and every individual person. So we spent time doing that. This isn't just a generalized effort on our part. And the time records back that up. And what Fox says, and what other cases that are considered Fox, and I believe even this court has held, is that when you do this kind of allocation, it's a very heavily intensive fact work. And the person who's best positioned to do that is the district judge. And that was Judge Reed, and she did it. She spent the time, effort, money, expense doing that. So we would say, no, this is not a simple pro rata windshield kind of appraisal. They were, it was a very fact intensive exercise by Judge Reed. There's some things you can highlight to show that the result the district court reached was not a result that somehow provides fees that would have been attributable to things other than non-federalist claims. Maybe I could just, if we think about this in a big picture way, first of all, and that is that, you know, from CRST's standpoint, they have wound up spending, I think, over $9 million. It was reduced to half originally because of the judge's local counsel rates, which were about 50%. So spending over $9 million, what kind of case would you spend over $9 million to defend? And the answer is there's no chance that CRST would have had its defense counsel spend this kind of money on a case that involved only the non-frivolous claims in this case, which are about nine. This should have been and would have been a very small case. It should have been. So you can say with certainty. Why because? Small because why? There should not have been this many claims. If you had not, if you take everything, there were only, Judge Reed found that there were only nine non-frivolous claims. How many? Nine. Nine out of the? And they were non-frivolous. The others were frivolous because of what? Well, there were several reasons for it. Well, are any of those issues before us? No, those have already been decided the first time around. In other words, we don't get into the merits of her? We do not, and that's important. In other words, no matter how wrong she might have been, for purposes of argument, that's not before us. Well, she wasn't wrong, and she was affirmed by this court. So all this diving back into who shot Georges, you know, it shouldn't be done. It's been decided. And I mean, I'd like to kind of just get back for a minute to what it was. Let's see. So how many valid claims were paid? None. How much money did you pay to any of these people, these women drivers? We settled one claim at the end of the day. It started off with 270 claims. By the time the case was over, had been to this court and back, only one claim survived. And that one claim was sent back for trial, and then we went back, got ready to try the case. And just before the case was tried, it was settled for what amounted to far less than cost of defense, $50,000. So we're not going to spend $9 million. I mean, I think what Justice Kagan said in Fox is instructive here, and that is that frivolous claims may increase the cost of defending a suit in ways that are not reflected in the number of hours billed. That's exactly what happened here. The frivolous claims increased the cost of this lawsuit dramatically. Again, there's no way you would spend this kind of money to defend against nine claims, the nine non-frivolous claims. So, I mean, from a macro standpoint, it's clear. So when you get down into the weeds and do the micro analysis, which Judge Reed did for each one of these claims, and you tie it back into the fee records, which we had to do, as a result, the last time we were here, we were sent back to present Judge Reed with individual expenses for each claim and to determine why each claim was unreasonable, which she did. And then we also presented our legal fees in the same way. She made those decisions. And so, I mean, at that point, it does get into the green-eye shade territory when you have to get into tying each expense to each claim. That's been done, for the most part, and the separations have been made. But I'd like to get back, if I could, just for a minute to what I started with, and that is that in Goodyear v. Hager, again, it's Justice Kagan who said that a district court may take into account its overall sense of a suit. I'd like to talk about Judge Reed's, just for a minute, her overall sense of this lawsuit. It's the forest, really, not the trees. She had a ground-level view of the proceedings from the very beginning, from start to finish. And under all circumstances, it's unreasonable for any plaintiff to file in federal court and pursue claims that have not been investigated. It would have been unreasonable without more for the EEOC to file and pursue uninvestigated claims in federal court. But here, it was doubly so because they had a statutory duty under Title VII to investigate sexual harassment claims before bringing them in federal court. Now, the statute doesn't create a special process of empty administrative formalism that somehow enables the EEOC to do that which it otherwise could not have done, namely file and pursue uninvestigated sexual harassment claims in federal court. No, it's exactly the opposite. The statute imposed an additional duty to investigate as part of an integrated, multi-step administrative process intended by Congress to facilitate the resolution of sexual harassment claims, employment discrimination claims, by informal means without ever getting to a federal court. And that's what got Judge Reed. Judge Reed, in her overall sense of suit, determined that EEOC's litigation strategy frustrated the essential purpose of this statute because what it did is it shifted all of the overhead, all of the expense, away from its own agency over to her federal court. Everything it was supposed to do with its own resources before filing suit, it instead proceeded to do by leveraging the jurisdiction and process of a federal district court. So this is an exceptionally rare case. It's a very rare case. In the reality of the situation, is CRST a model employer? Their employees were not guilty of any of these things? We were not. You're not? We were not. And keep in mind that we never got to the point. These were all allegations. There was no investigation here. There was not a single alleged harasser that was ever interviewed or deposed. So I'm standing here in front of you telling you today that we were prepared to defend every one of those claims, every last one of them. We did the work. We were ready to go to trial on each and every one of those claims. I got the impression from reading the government's brief that these truck cabs were veritable chambers of horror. Well, that's the way they litigated their case, wasn't it, just with allegations? Well, they must have had some proof of that. They did not. Judge Reed found it, and that's the point, Judge Wallman. Judge Reed looked at these claims. The menstruating woman in the truck cab? Pardon? The menstruating woman was going through her period in the truck cab? You know, Your Honor, once again, we've been through this twice now. Okay. And, you know, we were affirmed on appeal, and the answer to these questions were that there was not actionable Title VII misconduct by our company in any of these cases. And so it's not just not a case. Basically, it was a case of boys being boys. No, it was not. No, again, it was not. And I can't stand here and kind of get back to ground zero where we started 12 years ago. We've been through this. And the answer is no. Let's step back, because I think that there's been extensive litigation and rulings and rulings and more rulings on top of rulings. And I think at the end of the day, if I understand what the EEOC is arguing, is they're basically arguing that Judge Reed looked at this thing, said frivolous, because you hadn't done the pre-suit investigation, you hadn't verified the facts that you needed to verify, and that there was insufficient evidence as a matter of law to go forward on these claims that were all dismissed, right? Right. And so as a result, I'm going to award these attorneys fees, right? Now, the flip side of this is that the government's telling us that, well, they didn't have to do the pre-suit investigation, that they could have added these people to the lawsuit, and they know they lost that because they don't want to relitigate that. But, by gosh, they could have done it in other circuits, and, therefore, they were reasonable in their belief that they could do that. Now, that would be true, you would concede, if, in fact, sometime between the pre-suit investigation should have taken place, they actually put an investigation forward, developed facts and circumstances so that they could, in good faith, seek the amendment? Yes or no? Again, if they had what we've talked about as a pattern of practice claim, if there was some unifying factor here that would have applied in every instance, then arguably this would be a different case. But there wasn't. We've been through that, too. It's been established that there was never any common glue, if you were. There was nothing. These were always, always individual claims. So the answer to that question is, as individual claims, they should have been investigated individually prior to filing. They're not correct to say that the other circuits have held that they were able to do this. The law has always been, in this circuit and everywhere else, that you start off in the agency with a charge. Then you investigate. And, sure, if other claims arise out of the investigation, a reasonable investigation of the charge, you can add them, but then you must still conciliate them. And they didn't do any of that. They just figured they had a different strategy. What they're going to do is go right straight to federal court, instead of using their agency time, their agency lawyers. We all wound up doing this work. You're doing it today. This is work that should have been done 12 years ago, before any of these claims were filed. We've had to do it. We've been through this, claim by claim by claim. Those are things that should have been done before invoking federal jurisdiction. Judge Reed saw that. It took a while. At first, she didn't think it was so. But as we went on and we got to the point where we said, finally, can you just tell us who are the claimants going to be? We need to get to trial. She's a serious judge. She set a serious trial date. We all had to get ready. We need to know how to try the case. So the EEOC was required to identify who were the claimants going to be in this case. And at that point in time, they added in, I don't know, 180. They just pulled names off of the HR files. Now think about this. What are the chances that the names on our HR files, each one of them, is going to constitute actionable Title VII misconduct? What are the chances? What kind of reasonable person would think that everything that's in our HR files is actionable Title VII misconduct? The answer is that's unreasonable. It's unreasonable to litigate your case this way. It's unreasonable for you not to have investigated. It's unreasonable for you not to have gone through the process. It's unreasonable for you to have required Judge Reed, her staff, us, all the rest of us. It's unreasonable to ask your honors to have to look at the record here, individual case by case by case by case, to see if you agree with Judge Reed. All of that should have been done without ever invoking federal jurisdiction. That's what Judge Reed saw. And I'm not myself here arguing this. I'm defending Judge Reed right now. These are not our views. I mean, they are, to a certain extent, our views are more aggressive. Her views are what's before you here today, not me. These are things that she's found. She saw it. She's the one who gave summary judgment. We argued for it, mind you. But she saw that every last one of these claims lacked merit as an actionable Title VII case for a variety of reasons. And she's tied and documented, ticked every box at this point in time. And, you know, the statute itself, if you look at the statute, it provides for attorney's fees against the EEOC. It does. You may have to read it again and again, but it says the EEOC shall be liable. A defendant can get attorney's fees from the EEOC. Now, what kind of case would you get? We say it would be this case. And why is that? Because, as Christenberg says, Christenberg says that it gives narrow grounds, mind you. It narrows the grounds to frivolous, unreasonable, or groundless. But unreasonable is one of those grounds. Christenberg actually doesn't provide that you can't get attorney's fees except in the most extreme kinds of cases. To the contrary, Christenberg says that you do not have to show bad faith. Bad faith is the most extreme kind of circumstance. So Christenberg provides that you don't – something short of bad faith is all you need to show. And it says it must be either frivolous, unreasonable, or groundless. Those are the narrow grounds. Not beyond that. And Judge Reed was very careful to use the word reasonable all the way through her opinions. And so she found that we did satisfy the Christenberg standard in this exceptionally rare case. And we would say that given the statute, the statute provides defendants can get fees against the EEOC, that this would be that case. It would never be the case. And it doesn't really matter what the good lawyers, and they are good lawyers, at the EEOC thought. Because Christenberg makes it clear that we're not talking about subjective bad faith here. It doesn't matter. What we're talking about is an objective, unreasonable standard. Judge Reed made that objective determination. It was unreasonable to proceed without investigating any of these claims, without conciliating them, and should never have been in federal court. Thank you, Your Honor. Thank you, Mr. Mathias. Ms. Oxford? Just a few quick points. And first, with respect to Mr. Mathias' comment, what he said about the merits of EEOC's claims, the district court, in the first summary judgment decision, said, the cold statistics do not tell the entire story. The 156 female drivers variously suffered physical, mental, and or emotional abuse at the hands of their male co-drivers and lead drivers. When discovery was completed, CRST did not move for summary judgment on 34 EEOC claimants. The district court, applying a very rigorous standard, denied summary judgment on another 34 claimants. Those women alleged the elements of a sex harassment claim that would have gone to a jury, but for the district court's ruling on pre-suit requirements, which this court has affirmed, but which we explained we had more than some basis to think we could identify those individuals. Mr. Mathias said that we should have known before we filed this lawsuit that we could not add additional claimants once we were in litigation. Let me just say that CRST knew, within five months, first of all, they knew when we filed the suit that the complaint said, Monica Stark and a class of women. We didn't identify a single other person at that time. It was five months before we identified the first 18 claimants besides Monica Stark. We have provided the court in the appendix, volumes 19 to 21, have all of the billing records that counsel submitted to CRST. You can see the billing entries. For the first five months, they did massive amounts of legal work, knowing nothing except Monica Stark and a class of women, including we calculated over 100 hours, multiple individuals, gathering information from CRST on the number of women who had complained and the complaint files that CRST had generated, the investigation files. Mr. Mathias said that if you look at those billing records, which are in the appendix, you can see that they're tied to individual claimants and harassers. That's simply not true. He's forgetting the record. There are a few block entries where there are three or four women identified, preparing depositions for and then for women's names. But besides that, the entries read, working on summary judgment motion, there were seven separate summary judgment motions. I couldn't tell from any of those entries which ones they were doing. But again, another error that Mr. Mathias made, saying that there were only, I think he said, nine non-frivolous claims. There were 14, including the seven intervenors, who were also EOC claimants. So you can't tell. Their claims, the non-frivolous claims that Judge Reed found that were not intervenors and the seven intervenors, five of whom settled with CRST for unknown amounts, they are scattered throughout the summary judgment motions. CRST could not point to any particular work that it did, not only because they can't tell which billing entries relate to which summary judgment motion, but there were frivolous and non-frivolous claims. They grouped the summary judgment motions by issue. So the legal work they did to research and write the legal standard for an issue applied to both the frivolous and non-frivolous claims. No, I'm a stranger. I'm a latecomer to this case. To what extent are any of your arguments precluded by our court's earlier opinions? Which earlier? Or as I mentioned to my law courts when I discussed the case with them, is this case really about money or are there larger principles involved? There are much larger principles. As this court knows, fees can only be awarded against a losing plaintiff in Title VII if the claim was frivolous. So this case does not ask this court to act as put on your green eye shades and do a fine analysis of the fees. The district court adopted, imposed fees assuming Christiansburg was essentially a prevailing, merely a prevailing party standard. It was not. I see that my time is up, but we would ask this court to reverse it. Are there any further questions? Thank you. Thank you, Ms. Oxford. Thank you also, Mr. Mathias.  We'll take the case under advisement and attempt to promptly resolve the matters. Thank you.